IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

JUDY HEISEL,

      Plaintiff,

vs.

JEFFERSON COUNTY, IOWA;
CHAUNCEY MOULDING; LEE DIMMITT;
SUSIE DRISH; DEE SANDQUIST; and
AMANDA MORENO, M.D.,

      Defendants.

4:25-cv-00505-SHL-SBJ

ORDER GRANTING DEFENDANTS'
PARTIAL MOTION TO DISMISS

## I.  INTRODUCTION.

Plaintiff Judy Heisel alleges that her Fourth Amendment rights were violated when Jefferson County Attorney Chauncey Moulding waved his hand over her cell phone while it was sitting on a desk, causing the phone to illuminate and reveal information later used against Heisel in a criminal case. The Court concludes that Moulding is entitled to qualified immunity on Heisel's claim under 42 U.S.C. § 1983, as it is not "clearly established" that what he did is a "search" for Fourth Amendment purposes. The Court further concludes that Heisel has not stated viable claims for abuse of process or malicious prosecution under Iowa law against Moulding or his co-defendants. Defendants' Partial Motion to Dismiss (ECF 6) is therefore GRANTED.

## II.  BACKGROUND.

### A.  Factual Background.

On a motion to dismiss, the Court accepts as true the well-pleaded facts in Heisel's Petition at Law and Jury Demand. This action arises from a dispute between county employees in Jefferson County, Iowa. (ECF 1-2, ¶ 1.) Heisel started working for Jefferson County as Ambulance Service Base Manager in late May 2023. (Id., ¶ 17.) She reported to the Ambulance Director, Brian Thomas. (Id.) After Thomas resigned on or about April 17, 2024, Heisel was appointed Interim Ambulance Director. (Id., ¶¶ 19–22.)

On or about April 29, 2024, Heisel learned that Damien Wimmer, an Emergency Medical Technician for Jefferson County Ambulance services, engaged in conduct outside his scope of

practice. (Id., ¶ 25.) Heisel immediately reported the violation to Jack Reed and Dr. Amanda Moreno. (Id., ¶ 26.) Reed is a Human Resources contractor/consultant for Jefferson County (id., ¶ 46), while Dr. Moreno is the Jefferson County Ambulance Service Medical Director (id., ¶ 5). Wimmer received a two-week suspension. (Id., ¶ 27.) Pursuant to state law, the incident with Wimmer had to be reported to the Iowa Department of Health and Human Services ("DHHS"). (Id., ¶ 28.) Dr. Moreno assured Heisel she would take care of it. (Id.)

On or about May 31, 2024, Wimmer again engaged in conduct outside his scope of practice, this time in his role as Libertyville First Responder. (Id., ¶ 31.) When Heisel became aware of this, she reported it to Reed and Dr. Moreno, as well as regional EMS Coordinator Jacob Dodds. (Id., ¶ 32.) Dodds told Heisel that Dr. Moreno had not completed the complaint form from the earlier incident involving Wimmer. (Id., ¶ 33.) Dodds asked Heisel to complete the form for both incidents involving Wimmer. (Id.) Heisel completed and submitted both forms on June 21, 2024. (Id., ¶ 34.) The same day, Wimmer was terminated from his position with Jefferson County. (Id., ¶ 35.) Heisel alleges that Dr. Moreno has a close relationship with Wimmer and developed a grudge against Heisel for reporting the conduct that resulted in Wimmer's termination. (Id., ¶¶ 36–38.)

On or about May 20, 2024, the Jefferson County Board of Supervisors (the "Board") took action formally combining the Ambulance Director and Base Manager position into a single position under the title "Ambulance Director." (Id., ¶ 39.) Heisel performed the duties of both positions. (Id., ¶ 40.) On or about June 10, 2024, the Board characterized her position as "Interim Director/Manager/Paramedic." (Id., ¶ 41.) Her salary did not change, however, from the $65,000 annual salary she earned as Base Manager. (Id., ¶ 42.) All three members of the Board praised her for her work. (Id., ¶ 43.)

On or about May 13, 2024, the Board posted the Ambulance Director position. (Id., ¶ 44.) The posting was to stay open until June 7, 2024. (Id., ¶ 45.) Dee Sandquist, a member of the Board, unilaterally appointed Dr. Moreno and Reed to serve on the "hiring committee" and made clear that she would rely heavily on Dr. Moreno's opinion. (Id., ¶¶ 9, 46–47.) On or about June 5, 2024, Supervisor Sandquist admitted that she began personally reaching out to people to ask them to apply for the Ambulance Director position. (Id., ¶ 48.) Heisel initially did not submit a formal application because the Board told her it was unnecessary. (Id., ¶ 49.) But she later submitted one after all due to the Board changing its mind and asking her to do so. (Id., ¶ 50.) Heisel was the only

internal applicant for the position. (Id., ¶ 51.) She was interviewed via Zoom on June 20, 2024, by Supervisor Sandquist, Dr. Moreno, and Reed. (Id., ¶ 52.)

On June 24, 2024, Board members Lee Dimmitt and Susie Drish had a phone conversation regarding the hiring process for the Ambulance Director position. (Id., ¶¶ 7–8, 53.) Supervisor Dimmitt was in Heisel's office at the time and put the conversation on speaker phone so Heisel could listen and participate. (Id., ¶¶ 54–55.) Dimmitt expressed frustration with the input from Dr. Moreno and Reed because neither of them had the power to vote on the final decision. (Id., ¶ 56.) Dimmitt said the process was flawed and complained that Sandquist did not tell her or Drish the names of outside applicants. (Id., ¶¶ 57–58.) Dimmitt said he felt they already had the right person for the job: Heisel. (Id., ¶ 59.) Drish "did not disagree." (Id., ¶ 60.) This conversation later formed the basis for a complaint with the Iowa Public Information Board. (Id., ¶ 63.)

On June 26, 2024, Heisel had a second interview, this time at the Jefferson County Courthouse. (Id., ¶ 64.) All Board members were present, along with County Attorney Chauncey Moulding. (Id., ¶ 65.) Reed and Dr. Moreno participated via Zoom, the latter from Lake of the Ozarks, Missouri, where she was on vacation with Wimmer. (Id., ¶¶ 66–67.) Thirty minutes into the interview, Moreno began asking pointed questions about whether Heisel had a personal, sexual relationship with former Ambulance Director Brian Thomas. (Id., ¶¶ 68–71.) Heisel refused to talk about her personal life. (Id., ¶ 72.) The conversation became heated, with Dr. Moreno making accusations against Heisel about her sex life and drug use. (Id., ¶¶ 73–85.) After the interview, Dimmitt said the interview was handled in an "unprofessional" manner. (Id., ¶ 86.) On July 11, 2024, the Board voted 2–1 to reopen the Ambulance Director position, rather than hiring one of the three existing candidates. (Id., ¶¶ 87–94.)

After the Board meeting on July 11, 2024, Heisel spoke with Reed by phone. (Id., ¶ 95.) Reed said Dr. Moreno "opened up a floodgate of potential liability" based on her statements during the second interview. (Id., ¶ 96.) Reed said he warned County Attorney Moulding about this, and Moulding agreed. (Id., ¶ 97.) Reed encouraged Heisel to ask for another meeting to address the inappropriate nature of the second interview. (Id., ¶ 98.) Reed also told Heisel that he was in favor of her being hired as Ambulance Director. (Id., ¶ 99.) During a Board meeting on July 15, 2024, former Jefferson County HR contractor Paul Greufe said the Board's hiring process was inappropriate and unfair, especially to Heisel. (Id., ¶¶ 100–01.) Dimmitt expressed frustration with the process, too. (Id., ¶¶ 102–03.)

On July 29, 2024, the Board voted 2–1 to hire Josh Hemminger, a new candidate, for the Ambulance Director position. (Id., ¶¶ 105–06.) The Board set his salary at $85,000. (Id., ¶ 108.) Heisel learned about the Board's decision at a meeting on August 5, 2024. (Id., ¶ 109.) After the Board meeting, County Attorney Moulding, Supervisor Drish, Assistant County Attorney Elizabeth Estey, and Hemminger went to the Ambulance building to begin transitioning the Director position from Heisel to Hemminger. (Id., ¶ 110.) They suggested to Heisel that they might have a position for her, too, but refused to provide any details. (Id., ¶¶ 111–12.) After Heisel said she could not accept such an ambiguous offer, they presented her with severance paperwork, which Heisel rejected. (Id., ¶ 113.) Reed did not participate in these discussions. (Id., ¶ 114.) Heisel packed up her belongings and left that day, but not before providing information to Hemminger to help him perform his duties as Ambulance Director. (Id., ¶¶ 115–120.)

According to an affidavit later prepared by Moulding, an incident occurred in the Ambulance building before Heisel left. (Id., ¶ 131.) At some point, Heisel was asked to walk Hemminger around the Ambulance building, with Moulding, Estey, and Drish staying behind in the Director's office for a closed-door meeting. (Id., ¶ 131.a.) According to his affidavit, Moulding noticed that Heisel's cell phone was still on the desk even though she had left the room to walk around with Hemminger. (Id., ¶ 131.b.) Moulding waved his hand above the screen, causing the phone to "activate" in a way that led Moulding to believe the conversation between himself, Estey, and Drish was being audio recorded. (Id., ¶ 131.b.) Moulding claimed he did not touch or physically manipulate the phone. (Id., ¶ 131.c.) Moulding signaled to the others in the room that they were being recorded. (Id., ¶ 131.d.)

Later that day, two officers with the Fairfield Police Department were dispatched to the Ambulance building on a report of destruction of property. (Id., ¶ 121.) Moulding reported that the County IT Department notified him of a network intrusion of the computers in the building. (Id., ¶ 122.) The computers were factory reset, with information being lost. (Id.) One of the officers, Officer Rylee Nuno, prepared an investigative case summary report. (Id., ¶ 123.) No one was charged or arrested, nor did Nuno draft any investigative narratives. (Id.)

On August 13, 2024, a formal complaint was filed with the Iowa Public Information Board (the "IPIB") alleging a violation of the open meeting laws set forth Iowa Code Chapter 21. (Id., ¶ 124.) The alleged violation occurred on June 24, 2024, when Supervisors Dimmitt and Drish discussed the hiring process for the Ambulance Director position via phone. (Id., ¶ 124.) IPIB

4

emailed the complaint to County Attorney Moulding on August 16, 2024, along with an audio recording of the phone conversation between Supervisors Dimmitt and Drish. (Id., ¶ 125.) Supervisor Dimmitt signed an affidavit the same day regarding the matter. (Id., ¶ 126.) Moulding incorporated Dimmitt's affidavit into an affidavit of his own, which he signed on September 3, 2024. (Id.) The IPIB complaint was resolved informally, with the parties agreeing that the informal discussion between Supervisors Dimmitt and Drish could be interpreted as a violation of Iowa Code Chapter 21. (Id., ¶ 127.)

Moulding's affidavit alleged that Heisel recorded the meeting at the Ambulance building on August 5, 2024, in violation of Iowa Code §§ 728.8(2) and 808B.2(1)(a). (Id., ¶ 128.) Moulding ostensibly prepared the affidavit due to "additional concerns over criminal recording conducted by Ms. Heisel were raised in the subsequent weeks" after August 5, 2024. (Id., ¶ 129.) Moulding forwarded the affidavit to the Washington County Attorney's Office for an evaluation of whether charges should be filed. (Id., ¶ 130.) Moulding recognized that he could not prosecute any such case himself because he was a witness and close to the parties. (Id.) As noted above, the affidavit revolved around Moulding's allegation that Heisel left her cell phone on the desk in the Director's office of the Ambulance building while Moulding, Estey, and Drish had a closed-door meeting there. (Id., ¶ 131.a.) Moulding alleged that he believed the conversation between himself, Estey, and Drish was being audio recorded. (Id., ¶ 131.b.)

Moulding's affidavit was provided to Officer Nuno in September 2024. (Id., ¶ 132.) Nuno was not supposed to get guidance from Moulding on charging decisions due to Moulding's status as a witness, but Nuno initially called Moulding anyway before realizing this was improper. (Id., ¶¶ 133–34.) Nuno later testified that she did not have further communication with Moulding about the case after this call. (Id., ¶ 135.) On September 24, 2024, Nuno drafted a supplemental report based primarily on Moulding's affidavit. (Id., ¶ 136.)

On January 20, 2025, Nuno filed a criminal complaint and affidavit accusing Heisel of intercepting a communication in violation of Iowa Code § 808B.2(1)(a). (Id., ¶ 137.) The following day, Nuno filed a criminal complaint and affidavit accusing Heisel of electronic and mechanical eavesdropping in violation of Iowa Code § 727.8. (Id., ¶ 138.) On January 29, 2025, Moulding emailed Officer Nuno and Fairfield Police Chief David Thomas acknowledging the filing of the complaints and the issuance of a warrant for Heisel. (Id., ¶ 139.) Moulding said he "thought it

would be a good idea to pick up Heisel's phone to determine if the recording in question from August 5 remained on her phone." (Id.)

On April 8, 2025, Heisel was charged by Trial Information with Unlawful Interception of Communication, a Class D felony, in violation of Iowa Code § 808B.2(1)(a) and Electronic or Mechanical Eavesdropping, a serious misdemeanor, in violation of Iowa Code § 727.8(2). (Id., ¶ 140.) At trial, Moulding testified that he noticed Heisel's phone on the desk when he was meeting privately with Supervisor Drish in the office at the Ambulance building. (Id., ¶ 141.a.) He said the phone was "face up" and that he noticed it was recording, although he also said he didn't recall if it was in sleep mode or if it was on. (Id., ¶ 141.b–.c.) Moulding admitted to waving his hand over the screen but said he did so unintentionally. (Id., ¶ 141.d–.e.) He said he was not trying to manipulate the cell phone. (Id., ¶ 141.f.) He later admitted, after having his memory refreshed, that the phone was off and there was nothing on the screen when he first saw it. (Id., ¶ 141.g.) He also testified that timing and charging decisions were made entirely by the special prosecutor. (Id., ¶ 142.a.) Heisel was found not guilty of all charges by the jury. (Id., ¶¶ 143–44.)

> B. *Procedural History.*

Heisel's Petition asserts six causes of action: <u>Count I</u>, Sex Discrimination in Violation of the Iowa Civil Rights Act (against Jefferson County and Supervisors Dimmitt, Drish, and Sandquist); <u>Count II</u>, Violation of Iowa Public Policy (against Jefferson County, Dimmitt, Drish, and Sandquist); <u>Count III</u>, Slander Per Se and Slander Per Quod (against Jefferson County and Moreno); <u>Count IV</u>, Civil Rights Violation Under 42 U.S.C. § 1983, Violation of Fourth Amendment Right to be Free from Unreasonable Searches (against County Attorney Moulding); <u>Count V</u>, Malicious Prosecution (against Jefferson County and Moulding); and <u>Count VI</u>, Abuse of Process (against Jefferson County, Dimmitt, and Moulding). (Id., ¶¶ 145–87.)

Jefferson County, Moulding, and Dimmitt[1] (collectively, the "Jefferson County Defendants") move to dismiss Counts IV through VI. (ECF 6.) Heisel resists. (ECF 9.)

---

[1] Drish and Sandquist join the motion to dismiss as well (ECF 6, p. 1), but they are not named as Defendants in any of Counts IV through VI, so their involvement is unnecessary.

### III.   LEGAL STANDARD: MOTIONS TO DISMISS.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Rydholm v. Equifax Info. Servs. LLC*, 44 F.4th 1105, 1108 (8th Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "The plausibility standard requires a plaintiff to show at the pleading stage that success on the merits is more than a 'sheer possibility.'" *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678). In determining plausibility, the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847, 850 (8th Cir. 2012) (per curiam). The Court need not accept legal conclusions, however, and "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *United States ex rel. Ambrosecchia v. Paddock Lab'ys, LLC*, 855 F.3d 949, 955 (8th Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678).

### IV.   LEGAL ANALYSIS: COUNT IV.

In Count IV, Heisel brings a § 1983 claim against Moulding in his individual capacity for what she characterizes as an unreasonable search under the Fourth Amendment. Count IV revolves around Moulding waving his hand over Heisel's phone while it was on the desk in an office in the Ambulance building on August 5, 2024. Moulding argues that Count IV fails as a matter of law because he did not "search" the phone. (ECF 6-1, pp. 9–11.) He also argues, in the alternative, that he is entitled to qualified immunity.

#### A.   *Qualified Immunity.*

42 U.S.C. § 1983 imposes liability on any person who, acting under color of law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . ." Government officials are protected against section 1983 claims by the doctrine of qualified immunity, which frees them from liability unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity 'is an immunity from suit rather than merely a defense to liability.'" *Solomon v. Petray*, 699 F.3d 1034, 1038 (8th Cir. 2012) (emphasis omitted) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to

shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. Qualified immunity "is effectively lost if a case is erroneously permitted to go to trial." *Mitchell*, 472 U.S. at 526.

Government officials are entitled to qualified immunity "unless: (1) [they] violated a constitutional right, and (2) that constitutional right was clearly established so that a reasonable officer would know of the right at the time of the alleged violation.'" *Thurairajah v. City of Fort Smith*, 925 F.3d 979, 982 (8th Cir. 2019). "'Clearly established' means that, 'at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Manning v. Ryan*, 13 F.4th 705, 707 (8th Cir. 2021) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (cleaned up)). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quoting *Ashcroft*, 563 U.S. at 741).

Courts may address the two prongs of qualified immunity in either order, and a plaintiff must satisfy both prongs before a claim may proceed to trial. *See Pearson*, 555 U.S. at 241–42. "Under either prong of the inquiry, the district court 'may not resolve genuine disputes of fact' relevant to the issue of qualified immunity." *Wealot v. Brooks*, 865 F.3d 1119, 1125 (8th Cir. 2017) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam)). Moreover, all disputed facts must be interpreted in the plaintiff's favor when defendants move for judgment as a matter of law based on qualified immunity. *Tolan*, 572 U.S. at 657.

B. *Moulding Is Entitled to Qualified Immunity on Count IV.*

Consistent with the discretion afforded by *Pearson*, 555 U.S. at 241, the Court will focus on the second part of the qualified immunity inquiry: whether it is "clearly established" that waving your hand over a person's phone, as Moulding did here, constitutes a "search" under the Fourth Amendment. To evaluate this issue, it is helpful to start with governing Fourth Amendment principles. In *Katz v. United States*, 389 U.S. 347, 351 (1967), the Supreme Court held that the "Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Id.* "But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Id.* In a concurring opinion, Justice Harlan characterized the issue as whether the person has a "reasonable expectation of privacy" at the time and place the search occurs. *Id.* at 360 (Harlan, J., concurring). In subsequent cases, the Supreme Court has generally used the reasonable-

expectation-of-privacy test to determine whether an officer's action amounts to a Fourth Amendment search. *See, e.g., United States v. Jones*, 565 U.S. 400, 408 (2012); *Carpenter v. United States*, 585 U.S. 296, 304 (2018).

It can be difficult to draw lines under the reasonable-expectation-of-privacy test. For example, although mere "visual observations" are not searches for Fourth Amendment purposes, technology-enhanced encroachments sometimes are. *See generally Kyllo v. United States*, 533 U.S. 27, 31–39 (2001). Moreover, as technology has evolved, so too has the Supreme Court's reasonable-expectation-of-privacy jurisprudence. The Court has held for example, that Fourth Amendment searches occur when law enforcement officers gather cell-site location information reflecting a person's physical movements, *see Carpenter*, 585 U.S. at 313, conduct a manual search of all data stored on a cell phone, *see Riley v. California*, 573 U.S. 373, 386 (2014), or attach a GPS-tracking device on a vehicle, *see Jones*, 565 U.S. at 404. Similarly, in older cases, the Supreme Court held that a Fourth Amendment search occurred when law enforcement officers used a thermal imager to detect heat emanating from a home, *see Kyllo*, 533 U.S. at 40, and attached an electronic listening device to the outside of a telephone booth, *see Katz*, 389 U.S. at 358–59.

But not all uses of technology will turn law enforcement action into a Fourth Amendment search. For example, even without a warrant, law enforcement officers may conduct aerial surveillance on a private home and surrounding areas, *see Florida v. Riley*, 488 U.S. 445, 452 (1989), attach a pen register at the phone company to determine which phone numbers are being dialed from a private home, *see Smith v. Maryland*, 442 U.S. 735, 746–47 (1979), peer inside a barn on private property with the aid of a flashlight, *see United States v. Dunn*, 480 U.S. 294, 305 (1987), and collect microfilm copies of bank records reflecting a person's participation in commercial transactions, *see United States v. Miller*, 425 U.S. 435, 443 (1976). Context matters, too. A dog sniff of a vehicle during a lawful traffic stop is not a Fourth Amendment search, *see Illinois v. Caballes*, 543 U.S. 405, 409 (2005), but a dog sniff of the curtilage of a home *is* such a search, *see Florida v. Jardines*, 569 U.S. 1, 11–12 (2013). Similarly, officers do not conduct a Fourth Amendment search merely by closely inspecting property in a place they are allowed to be, *see Arizona v. Hicks*, 480 U.S. 321, 325 (1987), but they go too far when they physically manipulate luggage in an overhead bin in a manner that exceeds "casual contact," *see Bond v. United States*, 529 U.S. 334, 338–39 (2000).

A recent Eighth Circuit decision, *United States v. Puckett*, 139 F.4th 730, 740 (8th Cir. 2025), illustrates the line-drawing challenges that can arise in this area. There, a law enforcement officer moved a suspect's cell phone during a consent vehicle search in a way that caused the phone's home screen to "automatically illuminate." *Id.* When the screen illuminated, the officer saw icons for social media accounts that the defendant—a convicted sex offender—was not permitted to have. *Id.* at 736. The district court credited the officer's testimony that he did not "power on the cell phone, tap the screen, or otherwise manipulate it in a manner to power it on and reveal the digital data of the cell phone." *Id.* at 740. Instead, the officer "simply . . . mov[ed] it from the driver's seat" as part of the consent search. *Id.* Based on these findings—and because the defendant should have anticipated "incidental movement" of the cell phone when he left it on the passenger seat after giving consent to officers to search the car—the Eighth Circuit concluded the officer did not search the phone for Fourth Amendment purposes. *Id.* at 740–41.

It is debatable how *Puckett* applies here. On one hand, when the facts are viewed in the light most favorable to Heisel, they suggest that Moulding intentionally manipulated the cell phone by waving his hand over it in a way that prompted it to light up. This makes it look more like a search than the incidental movement of the phone in *Puckett*. *See Bond*, 529 U.S. at 338 (holding that intentional physical manipulation of a bag was a search). On the other hand, the surrounding context calls into doubt whether Heisel had a reasonable expectation of privacy in the phone's home screen, regardless of Moulding's intent. Take, for example, the fact that she used a sensitive enough setting for the phone that the mere waving of a hand was enough to activate the home screen. She arguably should have known in these circumstances that there was a likelihood of the phone being activated by incidental movement. *See Puckett*, 139 F.4th at 740 (holding that when the defendant authorized a search of his vehicle for drugs or stolen items, he should have known that it "could naturally result in the movement of items during the course of the search, including a cell phone"). If so, her Fourth Amendment argument is considerably weaker. *See id.*

Similarly, it is relevant for reasonable-expectation-of-privacy purposes that Heisel left the phone in the office, on the desk, while she walked around the Ambulance building with Hemminger. The Eighth Circuit has recognized that a person may not have a reasonable expectation of privacy in an item—even a sealed bag—that is left "out of place." *United States v. Stallings*, 28 F.3d 58, 61 n.5 (8th Cir. 1994). Here, Heisel made the curious decision to leave her phone on the desk just moments before Moulding, Drish, and Estey started a closed-door meeting

there—and not long after Heisel learned she was being replaced as Ambulance Director following a controversial hiring process in which Moulding and Drish participated. Given the well-known fact that cell phones have audio recording capabilities, a reasonable person in Heisel's position arguably should have known that Moulding, Drish, or Estey might briefly look at the phone's home screen to make sure it was not being used to eavesdrop on their private, closed-door conversation. *See id.* (holding that a bystander, upon encountering a sealed bag in an "out of place" location, reasonably would be expected to look inside). This, too, might defeat Heisel's Fourth Amendment argument even if Moulding intentionally manipulated the phone to activate it.

The bottom line is that the Court is unsure how the Supreme Court or Eighth Circuit would rule on Heisel's Fourth Amendment argument even when disputed facts are resolved in her favor. It follows that she has not established the existence of a "clearly established" right for purposes of her § 1983 claim. *See District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) ("It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply."). Moulding is therefore entitled to qualified immunity.

In arguing otherwise, Heisel cites *Alvarez v. City of Worcester*, 605 F. Supp. 3d 304, 310 (D. Mass. 2022), which held that "[o]pening a flip phone to view the contents of the inner screen of the phone constitutes a search because it exposes to view concealed portions of the phone." It is debatable whether *Alvarez* would have reached the same conclusion in the context of a non-flip phone given that the screens of such phones are typically viewable without manipulation anytime an incoming call or notification pops up. *See, e.g.*, *Adeleke v. Johnson*, No. 20-cv-5224, 2022 WL 4226042, at *6 (E.D.N.Y. Sept. 13, 2022) (holding that no Fourth Amendment search occurred when officer saw messages pop up during the processing of a cell phone). Even if Heisel is correct, however, that the waving of Moulding's hand is enough to constitute a Fourth Amendment search under *Alvarez*, the mere fact that one district court ruled in her favor in analogous circumstances is not enough to make the Fourth Amendment right "clearly established." *See Lane v. Nading*, 927 F.3d 1018, 1023 (8th Cir. 2019) (holding that a right is not "clearly established" even if it has been recognized by one appellate court and a handful of lower courts).

For these reasons, Count IV is DISMISSED for failure to state a claim.

## V.    LEGAL ANALYSIS: COUNTS V AND VI.

In Count V, Heisel asserts a claim for Malicious Prosecution against Jefferson County and Moulding. In Count VI, she alleges a claim for Abuse of Process against those two Defendants and Dimmitt. The relevant Defendants move to dismiss Counts V and VI based on her failure to plausibly allege actual malice (Count V) and/or that they engaged in an improper or unauthorized use of the legal system (Count VI).

### A.    Heisel Has Not Plausibly Alleged a Claim for Malicious Prosecution.

Count V arises out of the prosecution of Heisel for alleged violations of Iowa Code §§ 808B.2(1)(a) and § 727.8(2). The former makes it a Class D felony to "willfully intercept[], endeavor[] to intercept, or procure[] any other person to intercept or endeavor to intercept, a wire, oral, or electronic communication." Iowa Code § 808B.2(1)(a). The latter makes it a serious misdemeanor when a person, "having no right or authority to do so . . . by any electronic or mechanical means listens to, records, or otherwise intercepts a conversation or communication." *Id.* § 727(8)(2). "To 'intercept' means to acquire the contents of an oral communication by use of 'an electronic, mechanical, or other device.'" *Papillon v. Jones*, 892 N.W.2d 763, 770 (Iowa 2017) (quoting Iowa Code § 808B.1(6)). "An oral communication is a communication 'uttered by a person exhibiting an expectation that the communication is not subject to interception, under circumstances justifying that expectation.'" *Id.* (quoting Iowa Code § 808B.1(8)).

To state a claim for malicious prosecution under Iowa law, Heisel must plausibly allege: (1) a previous prosecution; (2) instigated by Jefferson County and/or Moulding; (3) termination of the case by acquittal or discharge; (4) lack of probable cause; (5) malice on the part of Jefferson County and/or Moulding; and (6) damage to Heisel. *Linn v. Montgomery*, 903 N.W.2d 337, 345 (Iowa 2017). Because Moulding is a public official, Heisel must allege "actual malice." *See Carter v. Ludwick*, 724 F. Supp. 3d 774, 815 (S.D. Iowa 2024) (citing *Moser v. Black Hawk County*, 300 N.W.2d 150, 152 (Iowa 1981)). Actual malice means "malice in fact, ill-will, or wrongful motive." *Vander Linden v. Crews*, 231 N.W.2d 904, 906 (Iowa 1975) (citation omitted). Actual malice "cannot simply be inferred from a lack of probable cause, but must be the subject of an affirmative showing that defendant's instigation of criminal proceedings against plaintiff was [p]rimarily inspired by ill-will, hatred or other wrongful motives." *Id.*

For two reasons, the Court agrees with Jefferson County and Moulding that Heisel has not stated a viable claim for malicious prosecution. First, the Petition does not sufficiently allege facts

indicating that Moulding had actual malice toward Heisel. Moulding's only alleged involvement in relevant events consisted of being present during Heisel's second interview on June 26, 2024 (ECF 1-2, ¶ 65), indicating during the interview that supervisors could ask "whatever they deemed appropriate," (id., ¶ 75), agreeing later that the interview might create liability for Jefferson County (id., ¶ 97), participating in events at the Ambulance building on August 5, 2024 (e.g., id., ¶¶ 117, 119, 122), receiving a copy of the complaint from the IPIB on August 16, 2024, regarding a potential violation of Iowa public meeting laws (id., ¶¶ 125–26), deciding in early September to draft and sign an affidavit accusing Heisel of secretly recording Moulding's private meeting with Drish and Estey at the Ambulance building on August 5 (id., ¶¶ 128–131), later suggesting that Heisel's phone be searched to see if it still contained a recording of the August 5 meeting (id., ¶ 139), and participating as a witness in Heisel's eventual trial (id., ¶ 141).

These allegations, even if proven, would not establish actual malice. Unlike her relationship with Dr. Moreno, Heisel does not allege anything about Moulding to suggest he had personal animosity against her at all, much less to the degree necessary to constitute actual malice. *See Vander Linden*, 231 N.W.2d at 906 (holding that malicious prosecution claim failed as a matter of law where plaintiff failed to present non-speculative evidence that defendant harbored animosity toward him). There is, for example, nothing in the Petition to the effect that Heisel and Moulding had heated conversations with each other or that he ever made disparaging comments about her. *See id.* Moreover, although Moulding apparently believed on August 5 that Heisel had recorded his private, closed-door conversation in the Ambulance building, he did not immediately seek to have her prosecuted. It was only after being notified on August 16 of the IPIB complaint regarding a different incident that Moulding developed "additional concerns over criminal recording conducted by Ms. Heisel" and decided to draft his affidavit. (Id., ¶¶ 129.) The fact that he did not immediately pursue charges further indicates an absence of actual malice. *See Hoffert v. Westendorf*, 854 F. App'x 93, 95 (8th Cir. 2021) (affirming dismissal of malicious prosecution claim where plaintiff "failed to make any non-conclusory allegations indicating that [defendant] acted with the requisite level of intent"); *Reed v. Linn County*, 425 N.W.2d 684, 686 (Iowa Ct. App. 1988) (affirming summary judgment for defendant in malicious prosecution claim based on absence of evidence of actual malice).

Even when Moulding became interested in having Heisel prosecuted, he appropriately sought the involvement of a different County Attorney as a special prosecutor due to Moulding's

13

relationship with the parties and status as a witness. (ECF 1-2, ¶ 130.) This reinforces the absence of actual malice. And while Heisel alleges that Moulding crossed the line by suggesting to investigators that they should search Heisel's cell phone, this is far too innocuous to state a viable claim. *See Klein v. Steinkamp*, 4:19-cv-00383, 2021 WL 4142686, at *5 (S.D. Iowa Aug. 26, 2021) (holding as a matter of law that actual malice did not exist even though defendant arguably could have made "better choice[s]"). Similarly, although Heisel takes issue with some of Moulding's trial testimony, she also admits that he corrected or clarified it on cross-examination. (ECF 1-2, ¶ 141.) She has not done enough in these circumstances to plausibly allege actual malice.

Second, and relatedly, Heisel does not allege facts indicating that Moulding lacked probable cause when he made the criminal referral. *See Linn*, 903 N.W.2d at 345 (absence of probable cause is an element of malicious prosecution). In that regard, one of the most striking features of Heisel's Petition is that it *never alleges that her phone did not record the meeting on August 5.* Instead, she appears to concede that her phone was in fact in recording mode. If so— and keeping in mind that Moulding was in a private, closed-door meeting when he saw the phone— there was probable cause to believe a criminal violation of electronic recording laws occurred. Indeed, the Iowa Supreme Court has affirmed a conviction under Iowa Code § 727.8(2) in similar circumstances. *See State v. Philpott*, 702 N.W.2d 500, 504 (Iowa 2005) (per curiam) (affirming conviction where employee left recording device in her office that would record conversations between others when she was not present).

Granted, Heisel alleges that Moulding only realized the conversation was being recorded because he manipulated the phone by waving his hand across it. As explained above, the Court is far from convinced that this is a Fourth Amendment violation in the circumstances presented here. Even if it is, the fact that Moulding narrowly crossed the line in an unsettled area of law is not enough in context to show actual malice. *See Klein*, 2021 WL 4142686, at *5. Count V is therefore DISMISSED for failure to state a claim.

B. *Heisel Has Not Plausibly Alleged a Claim for Abuse of Process.*

Count VI, for Abuse of Process, fails for similar reasons. "To prove a claim of abuse of process, a plaintiff must show (1) use of the legal process, (2) in an improper or unauthorized manner, and (3) that damages were sustained as a result of the abuse." *Stew-Mc Dev., Inc. v. Fischer*, 770 N.W.2d 839, 849 (Iowa 2009). "As to the second element, '[t]he plaintiff must prove that the defendant used the legal process *primarily* for an impermissible or illegal motive.'" *Gibson*

*v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 398 (Iowa 2001) (quoting *Wilson v. Hayes*, 464 N.W.2d 250, 266 (Iowa 1990)). The Iowa Supreme Court has "taken a very restrictive view of the primary purpose element . . . in the interest of protecting the right of ready access to courts." *Wilson*, 464 N.W.2d at 267. "Abuse of process claims routinely fail under the high burden we require for the second element." *Thomas v. Marion County*, 652 N.W.2d 183, 186 (Iowa 2002).

The Petition alleges that Moulding and Dimmitt used the criminal legal process "to aid the County in defending against an IPIB investigation, by which prosecution would allow Moulding to seize Plaintiff's phone, and to intimidate Plaintiff to not take civil action against the County for her wrongful end of employment." (ECF 1-2, ¶ 186.) In context, it is not plausible to conclude that the criminal referral was made "primarily" for these purposes. The IPIB investigation was already underway by the time Moulding and Dimmitt prepared affidavits regarding possible criminal violations by Heisel, and thus it is unclear how or why those affidavits would have assisted Jefferson County in defending the investigation. *See Lindaman v. Bode*, 478 N.W.2d 312, 315 (Iowa Ct. App. 1991) (affirming dismissal of abuse of process claim where defendants' alleged conduct would not have improved their position in any separate proceeding); *Phelps v. Powers*, 5 F. Supp. 3d 1036, 1042–43 (S.D. Iowa 2013) (dismissing abuse of process claim for failure to state a claim where petition failed to allege improper purpose). The same is true for the seizure of Heisel's phone: the Petition does not explain how it would have made a difference in a totally separate investigation. *See id.* For these reasons alone, the abuse of process claim fails as a matter of law. *See Wilson*, 464 N.W.2d at 267 (holding that an abuse of process claim is not viable when a party does "no more than carry the process to its authorized conclusion, even with bad intentions").

Even if initiating a criminal investigation of Heisel might have assisted the County in other matters, the Petition admits that Moulding promptly referred the criminal investigation to a special prosecutor from a different county. This is exactly what Moulding should have done and is another independently sufficient reason why neither he nor Dimmitt used the legal process for an improper purpose. *See Grell v. Poulson*, 389 N.W.2d 661, 664 (Iowa 1986) (holding that abuse of process claim fails as a matter of law unless plaintiff establishes "an irregular misuse of the process itself"). Following the referral, Moulding and Dimmitt were mere witnesses who reported possible criminal activity. The Iowa Supreme Court has squarely held that this is not enough to be liable for abuse of process even if the reports are false. *See Fuller v. Loc. Union No. 106 of United Bhd. of*

*Carpenters & Joiners of Am.*, 567 N.W.2d 419, 422 (Iowa 1997) ("[T]he mere report to police of possible criminal activity does not constitute legal process."). Here, the Petition does not even allege falsity; instead, Heisel appears to concede that what Moulding said about the phone being in recording mode is true. This, too, is fatal to the abuse of process claim. *Cf. Philpott*, 702 N.W.2d at 504 (affirming criminal conviction for similar conduct).

Simply put, there is no plausible basis for concluding that Moulding, Dimmitt, or Jefferson County committed the tort of abuse of process by referring an investigation to an outside prosecutor who later decided to charge the case based on the presence of evidence that the Iowa Supreme Court case found sufficient to establish a criminal offense in similar circumstances. Count VI is therefore DISMISSED for failure to state a claim.

## VI.    CONCLUSION.

The Jefferson County Defendants' Partial Motion to Dismiss (ECF 6) is GRANTED. Counts IV, V, and VI are DISMISSED for failure to state a claim. The dismissal is, however, WITHOUT PREJUDICE, as Heisel has suggested that she might wish to file an amended pleading. (ECF 9, ¶ 3.) Heisel is cautioned, however, that the Court does not believe she has come particularly close to stating a viable claim in Counts IV, V, or VI. Unless she can allege stronger facts—e.g., that Moulding flatly lied in accusing her of recording private conversations—she is unlikely to have a viable claim under § 1983 or state law theories of malicious prosecution and abuse of process.

IT IS SO ORDERED.

Dated May 4, 2026.

_____
Stephen H. Locher
UNITED STATES DISTRICT JUDGE